UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
R.C. and D.C., on behalf of N.C., a student
with a disability,

                                    Plaintiffs,

                                                                        **OPINION AND ORDER**

                    - against -
                                                                        No. 15-CV-5848 (CS)

BOARD OF EDUCATION OF THE WAPPINGERS
CENTRAL SCHOOL DISTRICT,

                                    Defendant.
-------------------------------------------------------------------x

<u>Appearances</u>:
Benjamin J. Hinerfeld
Philadelphia, Pennsylvania

Gina M. DeCrescenzo
White Plains, New York
*Counsel for Plaintiffs*

Neelanjan Choudhury
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

            Before the Court are Plaintiffs' Motion for Summary Judgment, (Doc. 13), and

Defendant's Cross-Motion for Summary Judgment, (Doc. 25).  Plaintiffs R.C. and D.C. ("RC

and "DC," or the "parents") bring this action on behalf of their child, N.C. ("NC"), pursuant to

the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. §§ 1401 *et*

*seq.*;[1] Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Title II of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12132; and Article 89 of the New York State

Education Law, against Defendant Board of Education of the Wappingers Central School

District (the "District").  Plaintiffs seek review of an administrative decision by a State Review

Officer ("SRO") at the New York State Education Department reversing the decision of an

Impartial Hearing Officer ("IHO").  The IHO found that:  (1) the District denied NC a Free and

Appropriate Public Education ("FAPE") during the 2012-13 and 2013-14 school years when its

out-of-district school recommendation, the Karafin School ("Karafin"), was insufficient to meet

NC's educational needs; (2) the private school – Maplebrook School ("Maplebrook") in Amenia,

New York – at which NC's parents placed her for those school years was an appropriate

placement for NC; (3) equitable considerations supported the parents' claim for reimbursement

because the parents gave the District adequate notice of their intention to find an out-of-district

placement for NC and worked with the District in order to do so; and (4) therefore the District

was required to reimburse the parents for the tuition at Maplebrook for those years.  (IHO

Decision 17-23.)[2]  The SRO disagreed with the IHO's conclusions on the first two points,

finding that the District's recommendation that NC be placed at Karafin was reasonably

calculated to enable her to receive educational benefits based on her needs, and that Plaintiffs

---

[1] The Individuals with Disabilities Education Act ("IDEA") was amended in 2004 by the IDEIA.  All references to and cases cited herein discussing the IDEA remain authoritative.

[2] "IHO Decision" refers to the decision of Impartial Hearing Officer Martin J. Kehoe III, dated December 29, 2014. This document forms part of the administrative record, a certified hard copy of which was sent to the Court on November 18, 2015.  The exhibits cited herein form part of the administrative record presented to the SRO and filed under seal.  They are referred to here as "Ex. [exhibit number]."  The complete list of exhibits is part of the record that was submitted to the SRO.  The transcript from the hearing before the IHO, also part of the record submitted to the SRO, is cited herein as "Tr. [page number]."

failed to present sufficient evidence to demonstrate that Maplebrook was an appropriate placement.  (SRO Decision 13-17.)[3]  The SRO did not reach the third issue.

Plaintiffs seek an order reversing the SRO's decision on both points, reinstating the IHO's decision in full, and awarding Plaintiffs tuition reimbursement for the 2012-13 and 2013-14 school years, among other things.  (Compl. at 31-32.)[4]  Defendant seeks an order affirming the SRO's decision and dismissing Plaintiffs' Complaint.  (D's Mem. 1.)[5]  For the reasons set forth below, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Cross-Motion for Summary Judgment is GRANTED.

## I.    Background

The following facts are undisputed unless otherwise noted.

### A.    NC's Treatment History

NC was born in Russia and adopted by RC and DC when she was eleven months old. (D's Counter 56.1 ¶ 1.)[6]  She has since been diagnosed with Pervasive Developmental Disorder – Not Otherwise Specified ("PPD-NOS"), which is a developmental disorder on the autism spectrum, as well as Mixed Expressive and Receptive Language Disorder.  (Id. ¶ 2.)

In September 2007, NC began seeing Dr. Theresa Yonker, a private psychiatrist with over twenty-three years of experience at the time of the administrative hearing in this case.  (Id.

---

[3] "SRO Decision" refers to the Decision of SRO Justyn P. Bates, dated 3March 30, 2015.  This document, like the IHO Decision, forms part of the administrative record, a certified hard copy of which was sent to the Court on November 18, 2015.

[4] "Compl." refers to Plaintiffs' Complaint, filed July 28, 2015.  (Doc. 4.)

[5] "D's Mem." refers to Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, (Doc. 26).

[6] "D's Counter 56.1" refers to Defendant's Response to Plaintiffs' Statement of Material Facts, (Doc. 29.)

Case 7:15-cv-05848-CS   Document 33   Filed 09/29/16   Page 4 of 33

¶ 3; P's Counter 56.1 ¶ 3.)[7]  In addition to NC's previously diagnosed disorders, Dr. Yonker

diagnosed her with Generalized Anxiety Disorder and said that at times, NC met the criteria for

Obsessive Compulsive Disorder.  (P's Counter 56.1 ¶¶ 4-6.)  Although Dr. Yonker would

typically seek alternative therapies for patients before relying on medication, she was concerned

that NC could become psychotic without it and prescribed a variety of medications at various

points in time to prevent NC from slipping into psychosis.  (*Id.* ¶¶ 8-9.)  According to Dr.

Yonker, NC was the "most unique" patient she had come across in her years of practice.  (*Id.* ¶ 7;

D's Counter 56.1 ¶ 4.)

NC attended schools in the District from elementary school through the first half of

twelfth grade.  (D's Counter 56.1 ¶ 5.)  Beginning in ninth grade, she was enrolled in a Regents

credit-bearing, self-contained program at the District's John Jay High School.  (Ps' Counter 56.1

¶ 10.)  Because NC was a student eligible for special education services, a local Committee on

Special Education ("CSE") – comprised of parents, teachers, a school psychologist and a district

representative – was responsible for working with NC and her parents to develop an

Individualized Education Program ("IEP") that set forth her social, emotional and educational

needs and goals.  *See* 20 U.S.C. § 1414(d)(1)(A)-(B); 34 C.F.R. 300.320-21; N.Y. Educ. Law

§ 4402; 8 N.Y.C.R.R. 200.3, 200.4(d)(2).

On March 8, 2010, the CSE met to discuss NC's program and placement for the 2010-11

(tenth grade) school year.  The CSE concluded that NC had significant delays in reading

comprehension, written expression and social skills, and was unable to participate in age-

appropriate activities.  (D's Counter 56.1 ¶ 6.)  It recommended that she be placed in an in-

_____

[7] "P's Counter 56.1" refers to Plaintiffs' Response to Defendant's Statement of Material Facts Not in Dispute, (Doc. 24.)

4

district special class and receive related services of speech/language therapy and counseling. (*Id.*)  NC was assigned a 2:1 aide and offered testing accommodations and adaptive physical education.  (*Id.*)

The CSE reconvened on April 6, 2011 and found that NC often brought up inappropriate topics of conversation with peers and experienced high anxiety and guilt.  (*Id.* ¶ 7.)  The CSE further stated that NC would benefit from remaining in classes with low student-to-teacher ratios and from receiving the support of a shared 2:1 aide.  (*Id.* ¶ 8.)  It also noted that she had pragmatic language delays that interfered with her expressive communication skills in the classroom setting.  (*Id.*)

As part of her IEPs, NC received regular counseling, and she met with school psychologist Beth Rizzi, as well as outside licensed clinical social workers Diane Ferris and Lori Dritz.  (Ps' Counter 56.1 ¶¶ 11-14.)  NC continued to see Dr. Yonker as well.  (*Id.* ¶ 13.)  During this time, NC was experiencing hallucinations, which included seeing spirits that she believed were real and physically present with her.  (*Id.* ¶¶ 14-15.)  She discussed these hallucinations with Rizzi and school counselor Heather Daley in counseling sessions.  (*Id.* ¶¶ 14, 22-23.)

Rizzi and Daley collaborated on how to address NC's hallucinations and strengthen her ability to differentiate between the physical and spiritual worlds.  (*Id.* ¶ 26.)  Rizzi worked with NC on coping skills to utilize in school.  (*Id.* ¶ 31.)  NC nonetheless continued reporting seeing a "spirit light," auras around some individuals in the form of halos, and the sensation of levitation. (*Id.* ¶ 32.)  By January 2012, NC reported seeing "spirit babies" during counseling sessions.  (*Id.* ¶ 34.)  She also reported a separation between her physical and spiritual self.  (*Id.*)  During this time, Dr. Yonker worked with NC on a weekly basis to ground her in reality.  (*Id.* ¶ 35.)

5

Between January and March 2012, NC's hallucinations began to increase significantly. (*Id.* ¶ 38.)  In March, NC reported seeing "souls, spirits and dogs."  (*Id.* ¶ 40.)  Rizzi believed that NC was having difficulty separating fantasy from reality and wanted to kill her "spirit self." (*Id.* ¶ 41.)  Later in March, NC was taken to Dr. Yonker, who reported that NC had suffered a definite psychotic break.  (*Id.*)  Yonker recommended stopping all of NC's activities, including school.  (*Id.*)  In April, NC was placed on home instruction for the remainder of the school year. (*Id.* ¶ 46.)  In May 2012, while NC was on home instruction, Dr. Yonker reported to Ms. Rizzi that she wanted NC to be evaluated by someone familiar with projective testing, and Yonker mentioned the possibility that NC might be schizophrenic.  (*Id.* ¶¶ 49-50.)

On June 22, 2012 and July 6, 2012, NC was examined by Dr. Kathleen Caproni, who conducted projective testing and issued a Psychological Assessment reporting that NC exhibited signs of prodromal thought disorders typically associated with pre-schizophrenic disorders.  (*Id.* ¶ 53; D's Counter 56.1 ¶¶ 13-14; Ex. 122, at 4-5.)  Dr. Caproni's report recommended, in part:

> [NC] will require an educational setting that minimizes the likelihood of psychotic process in the form of distressed visual delusions and/or hallucinations to emerge.  The assessment results support identified, specific triggers that typically proceed [*sic*] her delusional perceptions.  These are specifically visual overstimulation, complex emotional stimuli, and insufficient activity.  She will likely be highly challenged if asked to continue her education in a public High School setting, even if it is a small class environment.  As a management strategy designed to monitor her response to the school year, [NC] should be assessed at the same time each day as part of a "check in" around experiences of stress/physical agitation and anxiety.  A shared aide or guidance personnel could serve this function.
>
> . . . .
>
> Lifeskills and independence practice for [NC] is encouraged and developed by a continuation of IEP program modifications that echo those identified in her last psychological re-evaluation for the school district.  This will need to include [occupational training] services for social pragmatics.  Continued attendance at specialized camp to provide successful separation from home and other similar programming is highly recommended as possible and available.

Medications should be continued as prescribed by her current psychiatrist.  The assessment results clearly support the effectiveness of the current medications in managing what are likely pre-psychotic symptoms.

(Ex. 122, at 5-6.)[8]

Around this same time, NC's parents reported that during her time on home instruction, she had greatly improved.  (Ps' Counter 56.1 ¶ 51.)  As a result, the CSE again considered an in-District program for NC when it reconvened in June, August and September 2012.  (*Id.* ¶¶ 51, 57; D's Counter 56.1 ¶ 17-18.)  NC's mother requested that NC be allowed to complete her diploma in five years in order to reduce her stress level.  (D's Counter 56.1 ¶ 17.)  Additionally, the CSE and NC's parents discussed the possibility of NC entering into a vocational program.  (Ps' Counter 56.1 ¶ 59.)  NC enrolled in a school-to-work program at a bakery, where she would attend class for part of the day and work in the bakery for the remainder of the day.  (*Id.* ¶ 60; D's Counter 56.1 ¶ 18.)  The school-to-work program was put in place in conjunction with the recommendation to allow NC an extra year to complete her diploma.  (Ps' Counter 56.1 ¶ 60.)  NC indicated that she enjoyed working at the bakery.  (*Id.* ¶ 61.)

By November 2012, however, NC was again experiencing hallucinations and heightened anxiety, and had gone extended periods without sleep.  (*Id.* ¶ 63; D's Counter 56.1 ¶ 20.)  Accordingly, the CSE convened on November 8, 2012 at the request of NC's parents, and the District then prepared a report explaining the need to search for an out-of-District placement.  (Ps' Counter 56.1 ¶ 63; D's Counter 56.1 ¶ 20-21; Ex. 133.)  The report stated that NC would not succeed in a public school setting because her highly sensitive nature would be upset by: (1) insufficient access to therapeutic services; (2) overstimulation created by the large high

---

[8] Dr. Caproni also recommended that a functional MRI be performed on NC as a follow-up to her report, although no MRI results were ever reported to the District.  (P's Counter 56.1 ¶ 56-57.)  Plaintiffs deny that this information was ever withheld from the District.  (*Id.*)

school environment; (3) increased anxiety even in small special education classrooms; (4) high

sound volume; and (5) disciplinary concerns.  (D's Counter 56.1 ¶ 21.)  At this time, NC's

parents expressed their desire to search for alternative placements similar to Maplebrook, and

they believed Maplebrook to be a viable option.  (*Id.* ¶ 20; Ps' Counter 56.1 ¶ 62.)[9]  In December

2012, NC was again placed on home instruction.  (Ps' Counter 56.1 ¶ 65.)

      B.     <u>School Visits to Maplebrook and Karafin</u>

In late November 2012, NC and her mother, DC, visited Kaplan Career Academy, and

DC visited the Westchester Exceptional School on her own, but they determined that these two

schools were inappropriate.  (D's Counter 56.1 ¶ 22.)

After these unsuccessful visits, England arranged a five-day trial at Maplebrook for NC

in early January 2013.  (*Id.* ¶¶ 23-24; Tr. 999-1002.)  Maplebrook is a state-accredited secondary

school but not approved as a special education placement school.  (Ps' Counter 56.1 ¶ 103.)

Maplebrook's principal, Dominick Ferrusi, described Maplebrook as a boarding school rather

than a residential school, because the same staff works the entire day, even after classes are over

(as opposed to having a separate shift of staff at night).  (*Id.* ¶ 106.)  Maplebrook's philosophy is

to assist students in the transition to adulthood.  (*Id.* ¶ 105.)  He also testified that its student

body is comprised primarily of students with learning disabilities.  (*Id.*)  Maplebrook did not

accept students with conduct disorders.  (D's Counter 56.1 ¶ 47.)  Ferrusi testified that most

faculty and all staff had master's degrees, and the school provided regular professional

development to its faculty.  (*Id.* ¶ 51.)  Maplebrook had one school psychologist; her hours were

---

[9] The record is not clear as to who first suggested Plaintiffs visit Maplebrook.  Although Robert England, the District's Assistant Director of Special Education, did encourage the family to visit Maplebrook for a week-long trial early in the search for schools, NC's parents were pushing for NC to be placed at Maplebrook or a similar school before England even began exploring out-of-District options.  (*See* Tr. 995-99.)

from 8:00 a.m. to 4:00 p.m., although she lived on campus.  (Ps' Counter 56.1 ¶¶ 107-08.)

Maplebrook did not employ either a clinical psychologist or psychiatrist.  (*Id.* ¶ 109.)

RC testified that this trial went "very well."  (Tr. 1000.)  RC further testified that England

stated that he would submit NC's paperwork for Maplebrook to the CSE were she to be accepted

into the school.  (D's Counter 56.1 ¶ 24.)

Meanwhile, England contacted NC's parents and asked if they had visited Karafin.  (D's

Counter 56.1 ¶ 25.)  Bart Donow, the director of Karafin, testified that the school is an approved

special education day placement for students classified with learning disabilities, autism, and

other health impairments and emotional disturbance (including emotionally fragile students who

have difficulty handling everyday stressors and overreact to stimuli).  (Ps' Counter 56.1 ¶¶ 85-

86.)  Its maximum enrollment at any given time is limited to eighty-four students, and it has

twenty-four teachers on staff.  (*Id.* ¶ 88.)  Donow testified that Karafin is a therapeutic placement

school with counseling services and individualization.  (*Id.* ¶ 90.)  The school has a full-time

counselor and psychologist, and a counselor is available whenever necessary.  (*Id.* ¶¶ 92, 94.)

The staff is trained in behavioral strategies and participates in professional development.  (*Id.*

¶ 93.)  Donow testified that the school day runs from 8:30 a.m. to 2:30 p.m., and Karafin

operates on a 180-day school year, five days per week, providing a consistent daily and weekly

schedule.  (*Id.* ¶¶ 95, 97.)  Each student has his or her own academic schedule that is set for the

entirety of the school year.  (*Id.* ¶ 96.)  Each class has six students.  (*Id.* ¶ 89.)  Donow testified

that students are placed at Karafin due to being socially delayed or awkward, but the school

offers a program to address socialization through counseling and speech language services

focusing on pragmatic language.  (*Id.* ¶¶ 98-99.)

The family visited Karafin in early January 2013, accompanied by school psychologist Rizzi.  (D's Counter 56.1 ¶ 26.)  RC testified that they did not have a good experience at Karafin. According to RC, they did not think it was a good fit for NC because it lacked a vocational program, did not have recreational activities, and was in a converted office building with small, cluttered classrooms that had "stacks of books" and utilized "every available wall space."  (Tr. 266, 492-94, 1007, 1010-11.)  The parents were also concerned that Karafin did not have a cafeteria but instead, lunch was delivered on a lunch truck and the students ate in the gymnasium.  (*Id.* at 1010.)  RC further testified that he observed several students with their heads on their desks and others taking "timeouts" in hallway cubbies.  (*Id.* at 1010-11.)  The parents felt that this environment would upset NC due to her sensitivity to others' feelings.  (*Id.*) According to RC, after the visit NC reported not feeling comfortable at Karafin and having an upset stomach.  (*Id.* at 1012-13.)[10]  The parents also were dissatisfied with the absence of a school-to-work program, and England offered to develop one in which NC could be bused from Karafin to a job.  (Tr. 1007.)

England investigated Maplebrook as a possible placement but informed the parents that it was not a state-approved placement and therefore was not an option.  (Ps' Counter 56.1 ¶ 67.)

C.      The CSE's Recommendation

On January 15, 2013 the CSE met to discuss an out-of-District placement for NC.  (*See* Ex. 137.)  NC's parents felt that none of the state-approved programs they had visited to date, including Karafin, met NC's academic, social or emotional needs.  (*Id.* at 2.)  The CSE

---

[10] The parties offer differing accounts of Rizzi's reaction to Karafin.  RC testified that Rizzi approached DC immediately after the school tour and said she was very disappointed in the school, apologizing for setting up the visit.  (Tr. 1008.)  Rizzi herself testified only that she was concerned for NC because of her stomach ache and did not remember saying whether she thought Karafin was or was not an appropriate placement for NC.  (*Id.* at 486-88.)

recommended the Summit School as a program to visit, but the parents declined because that school admitted students classified as Emotionally Disturbed ("ED").  (*Id.*)  NC's parents stated that they checked the list of state-approved placement schools and felt that no school or program was suitable for NC's needs, but added that they were willing to expand the search to schools with residential programming.  (*Id.*)  They reiterated that they wanted to enroll NC in Maplebrook and stated that they believed Maplebrook was appropriate because it did not have any students classified as ED and allowed for more socialization opportunities.  (Ps' Counter 56.1 ¶ 66; Tr. 429.)  They also stated that they were pursuing legal options.  (Ex. 137, at 2.)  England represented that he would send application packets to schools other than Karafin but apparently did not do so.  (Ds' Counter 56.1 ¶¶ 28-29.)  Ultimately, the District recommended home instruction until an appropriate placement could be found.  (Ex. 137, at 2.)

On February 5, 2013, the parents emailed the District and indicated their intention to place NC at Maplebrook in ten business days and to seek reimbursement unless the District provided NC with an appropriate IEP.  (D's Counter 56.1 ¶ 29.)

On February 20, 2013, the CSE reconvened.  (*Id.*)  The meeting began with the participants discussing all components of NC's IEP, including her recent assessments and evaluations, present levels of performance, post-secondary goals, strengths and weaknesses, program modifications, and test accommodations.  (*See* Ex. 146, at 2.)  NC's parents confirmed that they no longer wanted her on a Regents track and questioned whether they should have made this shift earlier in light of her level of stress and the enjoyment she found in the school-to-work program.  (*Id.*)  The CSE discussed other possible school placements, but ultimately determined that only Karafin was appropriate for NC.  (*Id.*)  England told the parents he had been able to arrange a school-to-work program with Karafin.  (*Id.*)  NC's parents disagreed with

the CSE's placement recommendation, stating that they did not think NC would fit appropriately at Karafin because she did not feel comfortable there, and they expressed their desire to explore residential programs. (*Id.*) England suggested that the search for a mutually agreeable placement should be extended beyond the nearby region, (*id.*), and the CSE agreed to send application packets to other potential placements. (Ps' Counter 56.1 ¶ 69.)

The next day, NC's parents enrolled her at Maplebrook. (*Id.* ¶ 71; D's Counter 56.1 ¶ 31.)

Between February and June 2013 (during which time England left the District), the District did not contact NC or her parents. (D's Counter 56.1 ¶ 32.) The CSE eventually convened on June 21, 2013 to discuss NC's progress at Maplebrook and potential placements for the 2013-14 school year. (*Id.*; Ex. 156, at 2.) The CSE and NC's parents also discussed residential placements and whether a residential school might better suit NC's needs. (Ps' Counter 56.1 ¶ 73.) The CSE agreed to send out referral packets to more state-approved schools that could meet NC's needs (which was done six days later, (*see* Exs. 211-16)), and to reconvene in August to determine the appropriate educational placement for her. (Ex. 156, at 2.) An audio tape of the meeting reflects that, in trying to write NC's new IEP in light of the fact that Maplebrook was not state-approved, Rizzi commented that she was not sure what to put in the IEP because "we know that Karafin is not appropriate."[11] (D's Counter 56.1 ¶ 38; Ex. 240.) NC's parents reiterated that they did not want NC at a school with ED students. (Ex. 240.) In

---

[11] At the February 20, 2013 CSE meeting, Rizzi acknowledged that while Karafin was not ideal for NC socially, it had other strengths that "fit the bill." (Ex. 240.) The context of the June comment suggests that Rizzi meant that all present knew that the parents objected to Karafin (as opposed to Rizzi personally finding it unsuitable), (*see* Tr. 546-48), and indeed she testified that "what led [her] to that statement" was the fact that RC and DC had previously made clear that they found Karafin inappropriate, (Tr. 547). In any event, as discussed below, the outcome here would be the same whether or not Rizzi personally viewed Karafin as appropriate.

advocating for Maplebrook over Karafin, NC's parents noted that because NC is sensitive to others' feelings, being with emotionally disturbed children would be upsetting to her, pointing out that Maplebrook was for learning-disabled but not emotionally disturbed children.  (*Id.*)  The parties agreed that the CSE would seek other placements.  (*Id.*)

On August 5, 2013, NC's parents sent the District a ten-day notice stating their intent to enroll NC at Maplebrook for the 2013-2014 school year and to seek reimbursement.  (D's Counter 56.1 ¶ 34.)  On August 26, 2013, the CSE reconvened to review other potential placements that it had contacted for NC.  (P's Counter 56.1 ¶ 76.)  According to Laura DiStefano, who replaced England as chair of the CSE, the District had sought programs for NC with a therapeutic component, whether residential or day.  (*Id.* ¶ 77.)  Several schools did not accept NC, and NC's parents had declined to pursue one of the recommended programs.  (*Id.* ¶¶ 78-79; Ex. 240.)  At the meeting, the CSE recommended Karafin and also offered the parents the opportunity to pursue placement at another school called Orchard View.  (Ex. 240.)  Thereafter, NC again enrolled at Maplebrook.  (D's Counter 56.1 ¶ 34.)[12]

D.    Procedural History

    1.    Due Process Complaint

NC's parents filed a due process complaint on September 17, 2013.  (*See* Ex. 205.)  The parents alleged that the District failed to offer NC a FAPE for the 2012-13 and 2013-14 school years.  (*Id.* at 4.)

The parents first alleged that the CSE improperly classified NC, although they do not make that argument here.  The parents further alleged that the District failed to:  (1) provide NC

---

[12] In light of my disposition below, I need not detail how NC fared at Maplebrook.  Nor need I address the allegation that the parents intentionally delayed NC's graduation to secure more years of reimbursement.

with a program that could adequately address her academic, physical, social and emotional

needs; (2) consider private, therapeutic residential options; (3) offer NC an appropriate out-of-

District program and, subsequently, conduct an adequate search for an appropriate school; and

(4) timely present NC's information to approved out-of-District programs.  (*Id.*)

The parents also argued that their unilateral placement of NC at Maplebrook was

appropriate because Maplebrook offered programming and related services designed to meet

NC's unique needs and was the best environment for her anxiety and emotional well-being.  (*See*

Ex. 204, at 5.)  They asserted that equitable considerations weighed in their favor because they

always cooperated with the District, commissioned private evaluations, participated in the CSE

process, and timely expressed their disagreements with the CSE's recommendations.  (*Id.*)

The parents sought an order from the IHO ordering the District to:  (1) annul NC's IEP;

(2) develop an appropriate IEP including a recommendation for a residential placement; (3)

reimburse them for the cost of NC's tuition at Maplebrook for the 2012-13 and 2013-14 school

years; and (4) directly pay for NC's future attendance at Maplebrook.  (*Id.* at 6.)

2.   IHO Decision

The IHO conducted a hearing over six days between March 13, 2014 and May 22, 2014.

In his decision, issued December 29, 2014, he first found that the CSE did not err in classifying

NC even though she demonstrated some characteristics consistent with autism.  (IHO Decision

15-22.)

Next, the IHO found that the District failed to provide NC with a FAPE.  In so doing, he

noted that the District acknowledged it could not meet NC's unique needs and began seeking an

out-of-District placement for NC.  (*Id.* at 14.)  The IHO then found the District's

recommendation of Karafin to be inappropriate.  He noted that NC's parents objected to Karafin

14

because it was not residential, had no vocational school-to-work component, and had an "overall environment" that was not conducive to helping NC.  (*Id.* at 15-16.)  He discussed only the latter issue, crediting the testimony that Karafin was a "poor fit in terms of environment and sound." (*Id.* at 16.)  In light of the risks presented by NC's fragile emotional state, he concluded that "adequate assurance of NC's psychological well-being" could not be provided by a school with an environment that was "unstructured," in that it had been converted from an office building, had small, cluttered classrooms with all available wall space used, and served lunch in the gym. (*Id.* at 16-17.)  The IHO also credited RC's testimony that Ms. Rizzi mentioned being disappointed upon leaving the school visit.  (*Id.*)

The IHO next found that RC and DC had met their burden of showing the appropriateness of NC's placement at Maplebrook.  (*Id.* at 18.)  After noting that Maplebrook's residential nature was not the only factor he considered, he explained that Maplebrook's ability to accommodate NC's unique needs and guard her fragile psychological state made it appropriate.  (*Id.* at 20.)  According to the IHO, contributing factors were the school psychologist assigned to mentor NC and meet with her once per week or on an as-needed basis, and NC's ability to participate in therapeutic horseback riding.  (*Id.*)  The IHO also considered Maplebrook's ability to keep NC on task and the academic progress that she made during her first stint there.  (*Id.* at 20-21.)

Finally, the IHO found that equitable considerations supported reimbursing the parents because there was no evidence to suggest that they failed to give the District notice of their unilateral placement.  (*Id.* at 22.)

15

3.      SRO Decision

On March 30, 2015, the SRO issued an opinion reversing the IHO.  The SRO held that
"the CSE's decision to recommend a placement at Karafin was reasonably calculated to enable
the student to receive educational benefits for the latter portion of the 2012-13 and the entirety of
the 2013-14 school years . . . ."  (SRO Decision 15.)  In doing so, the SRO performed a thorough
examination of the record and of the IHO Decision.  (*See id.* at 1-9.)  The SRO found that
Karafin's "small structured class in a therapeutic environment, along with increased direct
instruction, counseling, staff trained in behavioral techniques and strategies, and speech-
language therapy," as well as Karafin's school psychologist and counselor on staff, all would
support NC's social, emotional and educational needs in a manner consistent with the
recommendations of psychological evaluators.  (*Id.* at 13-14.)  The SRO also credited
DiStefano's testimony that other students had been placed at Karafin and had been successful.
(*Id.* at 14.)  According to the SRO, the concerns about Karafin set forth by the IHO – that the
school was housed in an old office building, the classrooms were cluttered, all wall space was
utilized, and lunch was delivered by a lunch truck and eaten in the gymnasium – did not support
a finding that Karafin was an inappropriate placement.  (*Id.*)  The SRO further found that the
evidence in the hearing record did not support a finding that NC required a residential placement,
and that giving her one would violate the IDEA's requirement that she be provided a FAPE in
the least restrictive environment ("LRE").  (*Id.* at 15.)

The SRO went on to consider "for the sake of argument" whether Maplebrook was an
appropriate placement, and found that it was not.  (*Id.*)  The SRO stated that "the hearing record
shows that [NC] struggled significantly at Maplebrook and did not receive the therapeutic type of
environment she needed in order to receive educational benefit."  (*Id.* at 17.)  In making this

16

finding, the SRO pointed to NC's disciplinary record at Maplebrook, testimony showing that administrators did not do a good job keeping track of NC or responding to her requests for help and had no individualized plan to help her deal with her anxiety, and the general failure to articulate how Maplebrook provided the therapeutic environment that NC needed.  (*Id.*)

Because he found for the District on the first two prongs of the analysis, the SRO did not address whether equitable considerations favored tuition reimbursement.  (*Id.*)

## II.   <u>Discussion</u>

### A.   <u>IDEIA and New York Education Law Claims</u>

#### 1.   <u>Summary Judgment Standard</u>

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *Id.*  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted).  In reviewing an action pursuant to 20 U.S.C. § 1415(i) of the IDEA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380-81 (2d Cir. 2003).

In deciding the motion, the court undertakes what "has been characterized as modified *de novo* review."  *C.B. ex rel. W.B. v. N.Y.C. Dep't of Educ.*, No. 02-CV-4620, 2005 WL 1388964, at *12 (E.D.N.Y. June 10, 2005) (internal quotation marks omitted).  The district court must

engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited.  *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Walczak*, 142 F.3d at 129 (alteration and internal quotation marks omitted); *see M.H.*, 685 F.3d at 240.  In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination "must also be colored by an acute awareness of institutional competence and role."  *M.H.*, 685 F.3d at 244.  Deference to administrative decisions is particularly warranted where the district court's review "is based entirely on the same evidence as that before the SRO."  *Id.*  Reviewing courts should also be mindful that they are not to "substitute their own notions of sound educational policy for those of the school authorities which they review."  *Rowley*, 458 U.S. at 206.

Deference is given to the final decision of the reviewing state authority, even if the reviewing authority disagrees with the IHO who initially presided over the dispute, and in such an event, the IHO's decision may be given diminished weight.  *M.H.*, 685 F.3d at 241.  The Second Circuit has explained, however, that "[i]f a court concludes that an SRO's decision is inadequately reasoned, a better-reasoned IHO opinion may be considered instead."  *Reyes v.*

*N.Y.C. Dep't of Educ.*, 760 F.3d 211, 219 (2d Cir. 2014) (internal quotation marks omitted) (reversing district court and SRO and reinstating IHO decision).

2.     <u>Provision of a FAPE and Unilateral Placement in Private Schools</u>

The IDEIA serves to promote the education of children with disabilities. *See, e.g.*, *Walczak*, 142 F.3d at 122 (citing *Rowley*, 458 U.S. at 179). Under the statute, states that receive federal funding must provide disabled children with a FAPE, 20 U.S.C. § 1412(a)(1), which includes "special education and related services" tailored to meet the unique needs of the particular child, *id*. § 1401(9).

"The 'centerpiece of the statute's education delivery system' is the IEP, an educational program tailored to provide appropriate educational benefits to individual disabled students." *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). The IEP must be developed annually by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Walczak*, 142 F.3d at 122. The IDEA sets forth procedural and substantive requirements for IEPs, *see* 20 U.S.C. § 1414, but "does not itself articulate any specific level of educational benefits that must be provided through an IEP," *Walczak*, 142 F.3d at 130. Courts interpreting the IDEA make clear, however, that a school district is not required to "furnish[] . . . every special service necessary to maximize each handicapped child's potential," *Rowley*, 458 U.S. at 199 (interpreting the Education for All Handicapped Children Act, the predecessor to the IDEA), but rather that a "district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement," *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks omitted). Thus, a school district must devise

19

an IEP that is "reasonably calculated to enable the child to receive educational benefits," *Davis v. Wappingers Cent. Sch. Dist.*, 431 F. App'x 12, 14 (2d Cir. 2011) (summary order), but it need not "provide[] everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).  Finally, the "services must be provided in the least restrictive setting consistent with a child's needs."  *Id.* at 122.

New York's regulations implementing the goals of the IDEA "appear to track the IDEA closely."  *Frank G. v. Board of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006) (quoting *Bd. of Educ. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005)); *see* N.Y. Educ. Law §§ 4401–4410-b. Parents are entitled to challenge "any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student."  N.Y. Educ. Law § 4404(1); *see also* 20 U.S.C. § 1415(b)(6)(A) (same).  Such challenges must be heard at an impartial due process hearing conducted by the state or local education agency, *see* 20 U.S.C. § 1415(f), and either party may appeal an adverse decision to the appropriate state agency, *see id.* § 1415(g); N.Y. Educ. Law § 4404(2).  Once this administrative process is exhausted, a party may file a civil action in federal or state court challenging the administrative decision.  *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

"If a state receiving IDEA funding fails to give a disabled child a FAPE . . . , the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state."  *O'Shea*, 353 F. Supp. 2d at 454 (internal quotation marks omitted).  Parents who seek such reimbursement must satisfy the three-pronged "*Burlington/Carter*" test, which looks to:  (1) whether the school district's proposed program will provide FAPE; (2) whether the parents' private placement is appropriate; and (3) a

20

consideration of the equities.  *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993);

*Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).  To satisfy the first prong, the

school district bears the burden of proving that it timely provided FAPE to the student.  N.Y.

Educ. Law § 4404(1)(c).  The parents have the burden of satisfying the second prong and must

demonstrate that their unilateral private placement was appropriate.  *See, e.g., Gagliardo v.

Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).  Whether a parental placement is

appropriate turns on "whether a placement – public or private – is 'reasonably calculated to

enable the child to receive educational benefits.'"  *Frank G.*, 459 F.3d at 364 (quoting Rowley,

458 U.S. at 207).

3.     Whether the District's Placement Was Appropriate

As the SRO explained, "the crux of this dispute is whether the CSE's recommendation to

place [NC] at Karafin . . . was appropriate."  (SRO Decision 12.)

Plaintiffs argue that the Court should reinstate the IHO's decision because it more

thoroughly took into account the psychological evaluations of NC, and as a result, her

individualized needs, than did the SRO's decision.  (Ps' Mem. 10-11.)[13]  Plaintiffs also argue

that the IHO rightly pointed to Rizzi's and the parents' dissatisfaction with Karafin, reiterating

the now-familiar complaints about it – that "[t]he school was once an old office building that was

converted into a school; its classrooms were small and cluttered; all available wall space was

used – creating a distracting environment for a Student like this; and lunch was delivered to the

_____

[13] "Ps' Mem." refers to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment,
(Doc. 21).

21

students by a truck, and they ate in the gym." (*Id.* at 11-13.)[14]  Plaintiffs further assert that the SRO erred in several ways:  first, by "mechanically appl[ying] generic labels" to NC's abilities and the placement options, (*id.* at 15, 18); second, by failing to adequately credit Rizzi's testimony, (*id.* at 15-16); third, by engaging in improper speculation about whether Karafin would have the clutter cleaned up by the time NC attended, (*id.* at 16-17); and finally, by overly crediting the testimony of DiStefano and Karafin director Bart Donow, (*id.* at 18-20).

Defendant argues that the SRO Decision was more thorough, because in addition to analyzing all of the testimony and evidence relied on in the IHO Decision, it analyzed the testimony of Donow, as well as assessed Karafin's staff and its training, availability, schedule and ability to implement behavior interventions, and the fact that Karafin had students with similar emotional fragility issues as NC.  (D's Mem. 7-9.)  Defendant also asserts that the IHO failed to analyze why NC required a more restrictive setting – a residential program – than what the District offered.  (*Id.* at 10-11.)

I have reviewed the administrative record thoroughly, and based on the evidence – all of which was also presented to the SRO, *see M.H.*, 685 F.3d at 244 ("[T]he district court should afford more deference [to the SRO's decision] when its review is based entirely on the same evidence as that before the SRO . . . .") – conclude that the SRO's decision is supported by a preponderance of the evidence and deserves deference from this Court.  *See* 20 U.S.C. § 1415(i)(2)(C)(iii); *M.H.*, 685 F.3d at 244.  His review of the record was thorough – he appears to have considered all of the evidence submitted by the parties – and he set forth his decision in a well-reasoned, detailed opinion.

---

[14] Plaintiffs further argue that because Dr. Yonker and Dr. Caproni concurred that a "big loud place" with "floridly psychotic" students who might need to be restrained would be inappropriate for NC, (Tr. 880-83, 900-01), Karafin was inappropriate, (*id.*), even though the IHO did not discuss this issue.

Contrary to Plaintiff's assertions, the SRO Decision did give due weight to the psychological evaluations performed by, and opinions of, Dr. Yonker and Ms. Rizzi. (*See* SRO Decision 13-14 & n.12.) After noting that Dr. Yonker identified "visual overstimulation, complex emotional stimuli and insufficient activity" as triggers for NC's delusions, the SRO determined that Dr. Yonker's recommendation – that NC be placed in an environment "that minimizes the likelihood of psychotic process in the form of distressed visual delusions and/or hallucinations to emerge" – could be met by Karafin because of the school's small, structured classes, therapeutically trained staff, school psychologists and counselors. (*Id.*) He further accepted the IHO's finding that Rizzi believed that Karafin was not appropriate, but found that to be the opinion of but one CSE member, not the CSE itself, and that comparison of the placement to the student's needs, not the opinion of one individual, was determinative. The SRO thus took the views of Dr. Yonker and Ms. Rizzi into account. And he plainly considered NC's individualized needs, even though he gave more weight to the small, structured classes, therapeutic setting, counseling resources and trained staff of Karafin, whereas the parents placed more weight on the absence of emotionally troubled students whose issues might upset NC[15] and on the pleasantness of the physical surroundings. His analysis was not generic or based merely on labels.

Nor was it unreasonable for the SRO to take into account DiStefano's testimony that other students from the District with mental health issues had done well at Karafin, (*id.* at 14),

---

[15] The SRO (unlike the IHO) specifically referred to NC's possible triggers, (SHO Decision 13), but nothing in the record suggested that Karafin was a "big, loud place" or that its students were out of control or required restraints. To the contrary, Karafin is a small school (eighty-four or less students at any one time), (*see* Ps' Counter 56.1 ¶ 88), with small classes (six students per class), (*id.* ¶ 89). And while NC's parents were concerned about outbursts on the part of emotionally troubled classmates of NC, (*see id.* ¶ 66; Tr. 429.), they apparently observed no such incidents or other evidence of such behavior during their visit to Karafin which, according to its director, is appropriate for students who overreact to stimuli and other stressors. (Ps' Counter 56.1 ¶¶ 85-86.)

which is of course not wholly indicative of whether NC would succeed there, but is a reasonable factor to consider in determining the potential for success.  While each student is unique, and the success or failure of one does not guarantee the same outcome for another, it would be naive not to consider the track record of the institution in evaluating future placements.

And while the SRO's point that the clutter in Karafin classrooms might be reduced was indeed speculative, it was far from the only, or even a significant, basis for his decision.  Rather, that point was made as part of his explanation for rejecting the IHO's belief that Karafin was inappropriate because of the former use of the building and the state of the classrooms and walls. The SRO determined that the largely cosmetic concerns about Karafin set forth by the IHO did not render the placement inappropriate, and Plaintiffs have not shown that that determination was erroneous.  They have not explained why the school being housed in a former office building, or the lunch system, would be detrimental to NC's needs.  And while clutter and an excess of decoration could be distracting or even jarring for a student such as NC, it is not unreasonable to conclude, as the SRO and the CSE did, that Karafin's strengths in therapeutic programming and heightened staffing outweighed these potential drawbacks.  For instance, Defendant points out that one of Dr. Yonker's recommendations for NC was to check in with a counselor or psychologist at the same time every day – a procedure that Karafin could support because of its small size and numerous, trained staff.  Indeed, "unlike the IHO, the SRO examined and made a determination on each aspect of the Karafin program and . . . its appropriateness in comparison to NC's needs reflected on her IEP."  (D's Opp. 5.)  The setting at Karafin may be less than ideal, but the IDEA does not mandate ideal conditions, and Karafin has compensating benefits. Yet the IHO decision does not even address the strengths of the Karafin program or the

testimony of Karafin's director, and I cannot regard it as the better reasoned of the two
administrative decisions.

    The IHO also undertook no analysis on the issue of LRE.  While NC's parents wanted a
residential program, none of the professionals who provided information to the CSE had
recommended such a program.  The SRO took that fact, and the IDEA's mandate that a FAPE be
provided in the LRE, *see Walczak*, 142 F.3d at 132, into account in concluding that "Karafin
reflected the correct balance" despite NC's "serious needs."  (SRO Decision 15.)[16]

    I sympathize with Plaintiffs' desire to procure the best possible education for NC, and
with their frustration with the placement process.  But the law does not require the District to
place NC in the best possible environment – it merely requires the District to make a
recommendation that is reasonably calculated to enable NC to receive educational benefits in the
LRE.  *See Gagliardo*, 489 F.3d at 112.  The issue is not whether Karafin could meet NC's needs
better than Maplebrook.  Rather, it is whether there are adequate grounds for me to overrule the
SRO's judgment that the District's IEP recommending Karafin offered NC a FAPE.  I find there
are not.  I am not saying that reasonable minds could not differ on the best environment for NC,
but I also cannot say that the IHO's decision is better reasoned than the SRO's.  The SRO
decision reflects the reality that no program is going to be perfect.  It further reflects the reality
that a school with sufficient supports for a student as emotionally fragile and psychologically
complex as NC is going to have other students with emotional problems in attendance.
Similarly, a school with no students with significant emotional problems is not likely to have
sufficiently strong psychological services for a student whose issues are as serious and

---

[16] The IHO noted the parents' desire for NC to be able to participate in a school-to-work program at her out-of-
District placement, as she had done while in the public school, but dismissed as "unclear" the District's offer to
develop such a program for NC in conjunction with her placement at Karafin.  (IHO Decision 16 & n.2.)

complicated as NC's.  I cannot dismiss as unreasoned or unworthy of deference the SRO's assessment that the small classes and robust support offered by the therapeutically trained staff and professionals at Karafin, even in the presence of other students or physical surroundings that might be challenging for NC, made Karafin an appropriate placement.  While it seems clear that NC benefitted from attendance at Maplebrook, that does not render Karafin an inappropriate placement.

Because I find that Karafin was an appropriate recommendation for the 2012-13 and 2013-14 school years, I need not address whether the parents' unilateral placement was appropriate or whether equitable considerations would warrant reimbursement.  My review of the record, with due deference to the SRO's findings, show that the District fulfilled its responsibility.

For the reasons stated above, Defendant's Cross-Motion for Summary Judgment is granted with regard to Plaintiff's IDEIA and New York Education Law claims[17], and Plaintiffs' Motion for Summary Judgment is denied with regard to those claims.

---

[17] As discussed above, Article 89 of the New York Education Law sets forth regulations and administrative procedures that implement the goals of the IDEA and "track the IDEA closely."  *Frank G.*, 459 F.3d at 363 (internal quotation marks omitted); *see LV v. N.Y.C. Dep't of Educ.*, No. 03-CV-9917, 2005 WL 2298173, at *1 & n.1 (S.D.N.Y. Sept. 20, 2005).  Because Plaintiffs do not make allegations or offer evidence or arguments outside of the IDEA context to show that Defendant violated New York law specifically, *see, e.g.*, *D.J. v. N.Y.C. Dep't of Educ.*, No. 12-CV-7009, 2013 WL 4400689, at *5 (S.D.N.Y. Aug. 15, 2013) (examining allegations that CSE violated specific New York regulations); *Danielle G. v. N.Y.C. Dep't of Educ.*, No. 06-CV-2152, 2008 WL 3286579, at *8-14 (E.D.N.Y. Aug. 7, 2008) (same), and because both sides seem to agree that the Education Law and IDEA claims rise or fall together, summary judgment in favor of Defendant on the Article 89 claim, along with the IDEA claim, is appropriate.  *See Z.A. v. N.Y.C. Dep't of Educ.*, No. 15-CV-1539, 2016 WL 4766340 (S.D.N.Y. Sept. 13, 2016); *M.C. v. Lake George Cent. Sch. Dist.*, No. 10-CV-1068, 2012 WL 3886159 (N.D.N.Y. Sept. 6, 2012).

B.      Rehabilitation Act of 1973 and ADA Claims

1.      Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant

bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if

satisfied, the burden then shifts to the non-movant to present evidence sufficient to satisfy every

element of the claim.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v.*

*Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

"Though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994) (citation omitted); *see Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("[S]ummary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . .  [T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation.") (fourth alteration in original) (internal quotation marks omitted).

### 2. Section 504 and the ADA

Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

28

Similarly, Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  As the statutory language makes clear, "[a]part from the Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002).  I therefore analyze Plaintiffs' claims under the two statutes together. *See Rodriguez v. City of N.Y.*, 197 F.3d 611, 618 (2d Cir. 1999) (assessing ADA and Section 504 claims together); *Scruggs v. Meriden Bd. of Educ.*, No. 03-CV-2224, 2007 WL 2318851, at *16 (D. Conn. Aug. 10, 2007) (same).

The scope of protection under the Rehabilitation Act differs from that under the IDEA. "The Rehabilitation Act provides relief from discrimination, whereas [the] IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination." *BD v. DeBuono*, 130 F. Supp. 2d 401, 438 (S.D.N.Y. 2000).  To prove a violation of the Rehabilitation Act or ADA, a plaintiff must show that "(1) he is an individual with a disability; (2) he is otherwise qualified to participate in a particular program; (3) he was denied that participation based upon his disability; and (4) the program receives federal funds." *Id.* (citing *D'Amico v. City of N.Y.*, 132 F.3d 145 (2d Cir. 1998)).  A plaintiff may assert a Section 504 or ADA claim in conjunction with an IDEA claim on the theory that she has been "denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive"; in so doing, however, the plaintiff must show that "defendants acted with bad faith or gross misjudgment in the administration of disability services." *S.W. ex rel. J.W. v. Warren*, 528

F. Supp. 2d 282, 290 (S.D.N.Y. 2007); *see R.B. ex rel. L.B. v. Bd. of Educ.*, 99 F. Supp. 2d 411,

419 (S.D.N.Y. 2000) ("[i]n the special education context, . . . a plaintiff must show that

defendants acted with bad faith or gross misjudgment" in order to prevail on a Section 504 or

ADA claim).  As courts have explained:

> That a court may . . . come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required [under the IDEA], is not necessarily the same thing as holding that a [disabled] child has been discriminated against solely by reason of his or her [disability].   Therefore, something more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities, i.e., a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment.

*Zahran ex rel. Zahran v. N.Y. Dep't of Educ.*, 306 F. Supp. 2d 204, 213 (N.D.N.Y. 2004)

(alterations in original) (internal quotation marks omitted).

　　　　3.　　Discussion

Although Plaintiffs do not address their § 504 or ADA claims in their moving brief, they

do include a minimal defense of these claims in their brief in opposition to Defendant's motion

for summary judgment.  (*See* Ps' Opp. 15-17.)[18]  Plaintiffs point out in a footnote that they

address these claims under the Rule 12(b)(6) motion to dismiss standard because of Defendant's

citations to *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S.

662 (2009), and use of the language "fail to state a claim for which relief may be granted."  (*See*

Ps' Opp. 15 n.7.)  Regardless of the language used by either party, both have filed motions for

summary judgment, and the Court will evaluate Plaintiffs' claims under the appropriate summary

judgment standard.

---

[18] "Ps' Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, (Doc. 23).

Plaintiffs' argument seems to be that the District exhibited bad faith or gross misjudgment in two ways:  first, through England's failure to send out additional application packets to potential placement schools other than Karafin before the June 21, 2013 CSE meeting; and second, through the CSE's decision to offer Karafin as NC's IEP placement despite previous "concessions" by CSE members that Karafin was inappropriate.  (*Id.* at 16.)

Plaintiffs' claim fails because they have failed to put forth sufficient evidence that would raise a question of fact as to whether Defendant acted with bad faith or gross misjudgment. While Plaintiffs are correct that DiStefano conceded at the June 21, 2013 meeting that England had neglected to send out additional application packets before he left Defendant's employ, (*see* Ex. 240), this does not rise to the level of bad faith or gross misjudgment.  Plaintiffs have offered no evidence that this failure was knowing or intentional.  Indeed, when DiStefano and the rest of the CSE were alerted to this oversight at the meeting, they promised to send the application packets and followed through promptly (only six days after the meeting).  (*See* Ex. 211-16, 240.) As for Plaintiffs' second argument, while there may be a question of fact as to whether Rizzi thought that Karafin was an inappropriate placement,[19] the dissent of a CSE member does not suffice to demonstrate bad faith or gross misjudgment.  *See Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir. 1982) ("Experts often disagree on what the special needs of handicapped children are, and the educational placement of such children is often necessarily an arguable matter.").  The record contains no evidence that the CSE's collective placement decision, even if it was not unanimous, was the product of discrimination, bad faith or gross misjudgment.  To the contrary, the record (including the recordings of the CSE meetings) reveals that Defendant's

---

[19] Neither side seems to have asked Rizzi this question at the hearing before the IHO.

personnel treated NC's family with respect, sensitivity and professionalism in trying to find an appropriate placement for a child with unusual challenges.

Even if Defendant had violated the IDEA by failing to provide NC with a FAPE – which it did not – without actual evidence of bad faith or gross misjudgment, such a failure simply would not translate into a violation of the Rehabilitation Act or ADA.  *See Y.D. v. N.Y.C. Dep't of Educ.*, No. 14-CV-1137, 2016 WL 698139, at *6 (S.D.N.Y. Feb. 19, 2016) ("Allegations merely demonstrating disagreement with an IEP are . . . insufficient to state a Rehabilitation Act claim.").  Indeed, that the SRO and the Court agree that Defendant offered NC a FAPE "suggest[s] at the least that reasonable minds could differ on the subject in good faith."  *C.L. v. Scarsdale Union Free Sch. Dist.*, 913 F. Supp. 2d 26, 41 (S.D.N.Y. 2012); *see P.C. v. Oceanside Union Free Sch. Dist.*, 818 F. Supp. 2d 516, 533 (E.D.N.Y. 2011) ("Plaintiffs have failed to establish the predicate to a showing of bad faith or gross misjudgment – that there was a violation of the IDEA in the first place.")

Accordingly, Defendant's Motion for summary judgment is granted with respect to Plaintiffs' Rehabilitation Act and ADA claims, and Plaintiffs' Motion on those same claims is denied.

## III.   Conclusion

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is DENIED, and Defendant's Cross-Motion for Summary Judgment is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs. 13, 25), enter judgment for the Defendant, and close the case.

**SO ORDERED.**

Dated:  September 29, 2016
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.